FEDERAL POWER COMMISSION *v.* OREGON ET AL.

No. 367.   Argued March 2–3, 1955.—Decided June 6, 1955.

436

*Willard W. Gatchell* argued the cause for petitioner. With him on the brief were *Solicitor General Sobeloff, Assistant Attorney General Rankin, Oscar H. Davis, William H. Veeder, John C. Mason* and *Louis C. Kaplan.*

*Arthur G. Higgs,* Assistant Attorney General of Oregon, argued the cause for respondents. With him on the brief were *Robert Y. Thornton,* Attorney General, and *E. G. Foxley,* Deputy Attorney General.

*Rollin E. Bowles* argued the cause for the Oregon Division of the Izaak Walton League of America, Inc., as *amicus curiae,* supporting respondents. With him on the brief was *L. C. Binford.*

Motions to appear as *amici curiae* and adopt the brief of respondents were filed by the States of Indiana, by *Edwin K. Steers,* Attorney General; Louisiana, by *Fred S. LeBlanc,* Attorney General; Michigan, by *Thomas M. Kavanagh,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Daniel J. O'Hara,* Assistant Attorney General; Minnesota, by *Miles Lord,* Attorney General, and *Perry G. Voldness,* Special Assistant Attorney General; Montana, by *Arnold H. Olsen,* Attorney General, and *Charles W. Leaphart,* Assistant Attorney General; Nebraska, by *Clarence S. Beck,* Attorney General, and *Robert V. Hoagland,* Assistant Attorney General; Nevada, by *Harvey Dickerson,* Attorney General,

and *W. T. Mathews,* Special Assistant Attorney General; North Dakota, by *Leslie R. Burgum,* Attorney General; Pennsylvania, by *Herbert B. Cohen,* Attorney General, and *Lois G. Forer,* Deputy Attorney General; Texas, by *John Ben Shepperd,* Attorney General; Utah, by *E. R. Callister,* Attorney General, and *Robert B. Porter,* Assistant Attorney General; and Washington, by *Don Eastvold,* Attorney General, and *Joseph T. Mijich* and *Richard F. Broz,* Assistant Attorneys General.

MR. JUSTICE BURTON delivered the opinion of the Court.

As in *First Iowa Coop.* v. *Federal Power Commission,* 328 U. S. 152, this case illustrates the integration of the federal and state jurisdictions in licensing water power projects under the Federal Power Act.[1]   In the *First Iowa* case we sustained the authority of the Commission to license a power project to use navigable waters of the United States located in Iowa.   Here, without finding that the waters are navigable, the Commission has issued a comparable license for a power project to use waters on lands constituting reservations of the United States located in Oregon.   The State of Oregon questions the authority of the Commission to do this and the adequacy of the provisions approved by the Commission for the conservation of anadromous fish.[2]   For the reasons hereafter stated, we sustain the Commission.

In 1949, the Northwest Power Supply Company of Portland, Oregon, applied to the Federal Power Commission for a license to construct, operate and maintain a hydroelectric plant, constituting Pelton Project No. 2030,

---

[1] 41 Stat. 1063, as amended, 49 Stat. 838, 16 U. S. C. §§ 791a–825r.

[2] Fish ascending rivers from the sea for breeding purposes.   In this instance, especially salmon and steelhead trout.   For an outline of the general problem presented, see Schwartz, Federalism and Anadromous Fish, 23 Geo. Wash. L. Rev. 535.

on reserved lands of the United States on the Deschutes River in Oregon,[3] and, in 1951, the Portland General Electric Company of Portland, Oregon, succeeded to a supplementary application for that license.

The Pelton Project is designed to include a concrete dam 205 feet high and a powerhouse containing three 36,000-kilowatt generators. It is to be built across the Deschutes River on reserved lands of the United States located below the junction of its Metolius and Crooked River tributaries.[4] The western terminus of the dam is to occupy lands, within the Warm Springs Indian Reservation, which have been reserved by the United States for power purposes since 1910 and 1913.[5] The eastern terminus

---

[3] In 1924, the Columbia Valley Power Company, Inc., had applied to the Federal Power Commission for a license to develop Pelton Project No. 57 at substantially the same site. That license was issued but, due to the licensee's failure to proceed with construction as required by the Commission, it was canceled in 1936.

[4] The Deschutes River is entirely within the State of Oregon. It drains the eastern slope of the Cascade Range and flows northward, across the lands of the United States here involved, to the Columbia River, which it meets about 15 miles above The Dalles. The Commission has made no findings as to its navigability or as to the relation between its flow and the navigability of other streams. Throughout its lower 130 miles, which include the project site, it flows in a narrow canyon with an average fall of 17.6 feet per mile and, apparently, it is generally recognized as incapable of sustaining navigation. Accordingly, throughout this litigation, the river has been treated by all concerned as not constituting "navigable waters" of the United States as defined in § 3 (8) of the Federal Power Act, 49 Stat. 838, 16 U. S. C. § 796 (8). We do not pass either upon that question or upon the relationship to interstate commerce of the proposed use of the waters of the river.

[5] The Warm Springs Indian Reservation was established by the Treaty of June 25, 1855, with the Indians in Middle Oregon. Ratified by the Senate March 8, 1859, and proclaimed by the President April 18, 1859, it secured to the Indians "the exclusive right of taking fish in the streams running through and bordering said reservation . . . ." 12 Stat. 963, 964. Oregon has recognized that it is

of the dam is to be on lands of the United States which, at least since 1909, have been withdrawn from entry under the public land laws and reserved for power purposes.[6] The project calls for no permanent diversion of water as the entire flow of the river will run through or over the dam into the natural bed of the stream. This dam will make available the head and volume of water required for the project and the water impounded by it will create a narrow reservoir, submerging lands the title to which is or will be in the United States. Variations and interruptions in the flow of the stream, caused by temporary storage or use of water for power purposes, are to be controlled by a "reregulating dam" approved by the Commission and located on private property, to be acquired, about three miles below the power dam. No objection is made to the reregulating dam. To the extent that access to existing spawning grounds for anadromous fish is cut off by the power dam, other facilities on private property, to be acquired, are to be constructed and maintained on terms approved by the Commission and designed to develop an equal or greater fish population. Opportunities for recreational uses of the area are to be enhanced and no issue as to water pollution is before us.

bound by this Treaty. *Anthony* v. *Veatch*, 189 Ore. 462, 483–485, 220 P. 2d 493, 502–503. See also, *United States* v. *Winans*, 198 U. S. 371.

Indian Power Site Reserve No. 2 was created November 1, 1910, and Indian Power Site Reserve No. 294 was created October 8, 1913, both by the Secretary of the Interior under an Act of June 25, 1910, 36 Stat. 855, 858.

[6] Power Site Reserve No. 66 was created December 30, 1909, by the Secretary of the Interior and made permanent by an Executive Order of July 2, 1910, under an Act of June 25, 1910, 36 Stat. 847. In addition, a reservation occurred in connection with the application made to the Federal Power Commission, in 1924, for a license for Pelton Project No. 57. Comparable withdrawals were made in 1949 and 1951 in connection with the present application. See § 24 of the Federal Power Act, 41 Stat. 1075–1076, and amendments, 16 U. S. C. § 818.

The State of Oregon, the Fish Commission of Oregon, the Oregon State Game Commission and the Oregon Division of the Izaak Walton League intervened before the Commission and each filed objections to the granting of the license. Some of their objections related to the authority of the Commission to grant the license and others to the suitability of the proposed fish conservation facilities.

Following extended hearings, the Commission's presiding examiner recommended the license. After exceptions to that recommendation the Commission issued its opinion and an order granting the license. 10 F. P. C. 445, 450, 92 P. U. R. (N. S.) 247. The Commission found that a public need exists for the early completion of the project to meet a severe power shortage in the Pacific Northwest. It found also that the project is in the public interest, will provide for comprehensive development of the affected stretch of the Deschutes River, and will be consistent with further comprehensive development of that stream and of the Columbia Basin. It held that the improvements will contribute valuable public benefits which will not be available if the river is maintained in its present natural condition.[7] The Commission stated that

---

[7] "(44) Under present circumstances and conditions, and upon the terms and conditions hereinafter provided in the license, the project is best adapted to a comprehensive plan for the improvement and utilization of water-power development, for the conservation and preservation of the fish and wildlife resources, and for other beneficial public uses including recreational purposes.

"(45) The Portland General Electric Co. is a corporation organized under the laws of the State of Oregon and has submitted satisfactory evidence of compliance with the requirements of all applicable state laws insofar as necessary to effect the purposes of a license for the project." 10 F. P. C., at 456. And see §§ 9 (b) and 10 (a) of the Federal Power Act, 41 Stat. 1068, 16 U. S. C. § 802 (b), and 49 Stat. 842, 16 U. S. C. § 803 (a).

the project will be subject to all existing rights to the use of the waters of the river, whether perfected or not. It prescribed temporary measures to be taken to meet the needs of the anadromous fish during the construction of the project and approved certain permanent facilities, practices and expenditures in relation to such fish. The opinion stated "that no substantial evidence has been brought forward to show that the facilities proposed for conserving the fish will not maintain existing runs. Moreover, there are indications that the runs can be increased." 10 F. P. C., at 450, 92 P. U. R. (N. S.), at 252.

A rehearing being denied, the State and its agencies sought a review by the Court of Appeals for the Ninth Circuit and the Portland General Electric Company intervened. That court, with one judge dissenting, set aside the Commission's order. 211 F. 2d 347. It recognized the necessity of a license from the Federal Power Commission but held that Congress, by its public lands legislation, long ago had transferred to the State of Oregon such control over the use of nonnavigable waters that the sponsor of the Pelton Project must secure also the permission prescribed by the State. We granted certiorari because of the public significance of the issues but denied leave to the Portland General Electric Company to intervene here. 348 U. S. 868. 28 U. S. C. § 1254 (1); 49 Stat. 860–861, 16 U. S. C. § 825*l* (b). Several States filed briefs as *amici curiae,* usually adopting as their own the brief filed by respondents.

We divide our consideration of the issues into three parts.

## I. APPLICABILITY OF THE FEDERAL POWER ACT.

On its face, the Federal Power Act applies to this license as specifically as it did to the license in the *First Iowa* case. There the jurisdiction of the Commission turned

almost entirely upon the navigability of the waters of the United States to which the license applied. Here the jurisdiction turns upon the ownership or control by the United States of the reserved lands on which the licensed project is to be located.[8]  The authority to issue licenses

[8] "SEC. 4. The Commission is hereby authorized and empowered—

"(e) To issue licenses . . . to any corporation organized under the laws of the United States or any State thereof . . . for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, or *upon any part of the public lands and reservations of the United States* . . . : *Provided,* That *licenses shall be issued within any reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired,* and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the *adequate protection and utilization of such reservation:* . . . .

"SEC. 23. . . .
"(b) It shall be unlawful for any person, State, or municipality, for the purpose of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto across, along, or in any of the navigable waters of the United States, or *upon any part of the public lands or reservations of the United States* (including the Territories), or utilize the surplus water or water power from any Government dam, except under and in accordance with the terms of a permit or valid existing right-of-way granted prior to June 10, 1920, or a license granted pursuant to this Act. Any person, association, corporation, State, or municipality intending to construct a dam or other project works across, along, over, or in any stream or part thereof, other than those

in relation to navigable waters of the United States springs from the Commerce Clause of the Constitution. The authority to do so in relation to public lands and reservations of the United States springs from the Property Clause—"The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ." Art. IV, § 3.[9]

In the instant case the project is to occupy lands which come within the term "reservations," as distinguished from "public lands." In the Federal Power Act, each has its established meaning. "Public lands" are lands subject to private appropriation and disposal under public

defined herein as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States shall before such construction file declaration of such intention with the Commission, whereupon the Commission shall cause immediate investigation of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such proposed construction, such person, association, corporation, State, or municipality shall not construct, maintain, or operate such dam or other project works until it shall have applied for and shall have received a license under the provisions of this Act. *If the Commission shall not so find, and if no public lands or reservations are affected,* permission is hereby granted to construct such dam or other project works in such stream upon compliance with State laws." (Italics supplied except for the initial word of the proviso.) 49 Stat. 839, 840, 846, 16 U. S. C. §§ 797 (e), 817.

[9] In what is somewhat of a companion case to the one before us, the Court of Appeals for the Ninth Circuit has recognized that, despite contentions as to state control of the use of water and the conservancy of fish within the Columbia River Basin, the Federal Power Commission has the authority to make effective a license and to provide facilities for anadromous fish much as is here proposed, when the waters involved are navigable waters of the United States. *Washington Department of Game* v. *Federal Power Commission,* 207 F. 2d 391. We denied certiorari April 5, 1954. 347 U. S. 936.

land laws. "Reservations" are not so subject.[10] The title to the lands upon which the eastern terminus of the dam is to rest has been in the United States since the cession by Great Britain of the area now comprising the State of Oregon. Even if formerly they may have been open to private appropriation as "public lands," they were withdrawn from such availability before any vested interests conflicting with the Pelton Project were acquired.[11] Title to the bed of the Deschutes River is also in the United States.[12] Since the Indian Treaty of 1855, the lands within the Indian reservation, upon which the western end of the dam will rest, have been reserved for the use of the Indians. More recently they were reserved for power purposes [13] and the Indians have given their consent to the project before us. Accordingly, there is no issue here as to whether or not the title to the tribal lands is in the United States.[14]

There thus remains no question as to the constitutional and statutory authority of the Federal Power Commission

---

[10] "SEC. 3. The words defined in this section shall have the following meanings for purposes of this Act, to wit:

"(1) 'public lands' means such lands and interest in lands owned by the United States as are subject to private appropriation and disposal under public land laws. It shall not include 'reservations', as hereinafter defined;

"(2) 'reservations' means national forests, tribal lands embraced within Indian reservations, military reservations, and other lands and interests in lands owned by the United States, and withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws; also lands and interests in lands acquired and held for any public purposes; but shall not include national monuments or national parks; . . . ." 49 Stat. 838, 16 U. S. C. § 796 (1) and (2).

[11] See note 6, *supra*.

[12] See *United States* v. *Utah*, 283 U. S. 64, 75.

[13] See note 5, *supra*.

[14] See *Hynes* v. *Grimes Packing Co.*, 337 U. S. 86, 103–104; *Minnesota* v. *United States*, 305 U. S. 382, 386.

to grant a valid license for a power project on reserved lands of the United States, provided that, as required by the Act, the use of the water does not conflict with vested rights of others.[15]   To allow Oregon to veto such use, by requiring the State's additional permission, would result in the very duplication of regulatory control precluded by the *First Iowa* decision.   328 U. S. 152, 177–179.   No such duplication of authority is called for by the Act.[16]   The Court of Appeals in the instant case

---

[15] "SEC. 27. That nothing herein contained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein."   41 Stat. 1077, 16 U. S. C. § 821.

[16] "To require the petitioner to secure the actual grant to it of a state permit . . . as a condition precedent to securing a federal license for the same project under the Federal Power Act would vest in the Executive Council of Iowa a veto power over the federal project.   Such a veto power easily could destroy the effectiveness of the Federal Act.   It would subordinate to the control of the State the 'comprehensive' planning which the Act provides shall depend upon the judgment of the Federal Power Commission or other representatives of the Federal Government.

. . . . .

"In the Federal Power Act there is a separation of those subjects which remain under the jurisdiction of the States from those subjects which the Constitution delegates to the United States and over which Congress vests the Federal Power Commission with authority to act. To the extent of this separation, the Act establishes a dual system of control.   The duality of control consists merely of the division of the common enterprise between two cooperating agencies of government, each with final authority in its own jurisdiction.   The duality does not require two agencies to share in the final decision of the same issue.   Where the Federal Government supersedes the state government there is no suggestion that the two agencies both shall have final authority. . . .

. . . . .

"The Act leaves to the States their traditional jurisdiction subject to the admittedly superior right of the Federal Government, through

agrees. 211 F. 2d, at 351. And see *Washington Depart-ment of Game* v. *Federal Power Commission,* 207 F. 2d 391, 395–396. Authorization of this project, therefore, is within the exclusive jurisdiction of the Federal Power Commission, unless that jurisdiction is modified by other federal legislation. See *United States* v. *Rio Grande Irrigation Co.,* 174 U. S. 690, 703; *Gutierres* v. *Albuquer-que Land Co.,* 188 U. S. 545, 554.

## II. INAPPLICABILITY OF THE DESERT LAND ACT OF 1877 AND RELATED ACTS.

The State of Oregon argues that the Acts of July 26, 1866,[17] July 9, 1870,[18] and the Desert Land Act of

Congress, to regulate interstate and foreign commerce, administer the public lands and reservations of the United States and, in certain cases, exercise authority under the treaties of the United States." *First Iowa Coop.* v. *Federal Power Commission,* 328 U. S. 152, 164, 167–168, 171.

[17] "SEC. 9. *And be it further enacted,* That whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, *have vested and accrued,* and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of *such vested rights* shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes aforesaid is hereby acknowledged and confirmed: *Provided, however,* That whenever, after the passage of this act, any person or persons shall, in the construction of any ditch or canal, injure or damage the possession of *any settler on the public domain,* the party com-mitting such injury or damage shall be liable to the party injured for such injury or damage." (Italics supplied except for the initial words of the enacting clause and the proviso.) 14 Stat. 253, see 43 U. S. C. § 661.

[18] "SEC. 17. . . . *all patents granted, or preemption or homesteads* allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by the ninth section of the act [14 Stat. 253, *supra*] of which this act is amenda-tory. . . ." (Italics supplied.) 16 Stat. 218, see 43 U. S. C. § 661.

1877 [19] constitute an express congressional delegation or conveyance to the State of the power to regulate the use of these waters. The argument is that these Acts preclude or restrict the scope of the jurisdiction, otherwise apparent on the face of the Federal Power Act, and require the consent of the State to a project such as the one before us.

The nature and effect of these Acts have been discussed previously by this Court. The purpose of the Acts of 1866 and 1870 was governmental recognition and sanction

---

[19] ". . . it shall be lawful for any citizen of the United States, or any person of requisite age 'who may be entitled to become a citizen, and who has filed his declaration to become such' and upon payment of twenty five cents per acre—*to file a declaration* under oath with the register and the receiver of the land district in which any desert land is situated, *that he intends to reclaim a tract of desert land* not exceeding one section, by conducting water upon the same, within the period of three years thereafter, *Provided however* that the right to the use of water by the person so conducting the same, *on or to any tract of desert land* of six hundred and forty acres shall depend upon bona fide prior appropriation: and such right shall not exceed the amount of water actually appropriated, and necessarily used for the purpose of irrigation and reclamation: and all surplus water over and above such actual appropriation and use, together with the water of all, lakes, rivers and other sources of water supply *upon the public lands and not navigable,* shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights. *Said declaration shall describe particularly said section of land* if surveyed, and, if unsurveyed, shall describe the same as nearly as possible without a survey. At any time within the period of three years after filing said declaration, *upon making satisfactory proof to the register and receiver of the reclamation of said tract of land in the manner aforesaid,* and upon the payment to the receiver of the additional sum of one dollar per acre for a tract of land not exceeding six hundred and forty acres to any one person, *a patent for the same shall be issued to him. Provided,* that *no person shall be permitted to enter more than one tract of land* and not to exceed six hundred and forty acres which shall be in compact form." (Italics supplied except for the initial words of the provisos.)    19 Stat. 377, 43 U. S. C. § 321.

of possessory rights *on public lands* asserted under local laws and customs. *Jennison v. Kirk,* 98 U. S. 453. The Desert Land Act severed, for purposes of private acquisition, soil and water rights *on public lands,* and provided that such water rights were to be acquired in the manner provided by the law of the State of location. *California Oregon Power Co.* v. *Beaver Portland Cement Co.,* 295 U. S. 142. See also, *Nebraska* v. *Wyoming,* 325 U. S. 589, 611–616.

It is not necessary for us, in the instant case, to pass upon the question whether this legislation constitutes the express delegation or conveyance of power that is claimed by the State, because these Acts are not applicable to the reserved lands and waters here involved. The Desert Land Act covers "sources of water supply upon the public lands . . . ." The lands before us in this case are not "public lands" but "reservations." Even without that express restriction of the Desert Land Act to sources of water supply on public lands, these Acts would not apply to reserved lands. "It is a familiar principle of public land law that statutes providing generally for disposal of the public domain are inapplicable to lands which are not unqualifiedly subject to sale and disposition because they have been appropriated to some other purpose." *United States* v. *O'Donnell,* 303 U. S. 501, 510. See also, *United States* v. *Minnesota,* 270 U. S. 181, 206. The instant lands certainly "are not unqualifiedly subject to sale and disposition . . . ." Accordingly, it is enough, for the instant case, to recognize that these Acts do not apply to this license, which relates only to the use of waters on reservations of the United States.

III. Application of the Federal Power Act to This Project.

Finally, respondents question the discretion used by the Commission in granting the license. They point to

the consequences which the project will have beyond the limits of the reserved lands on which it will be located.

The first consequence is the inevitable variation in, or the temporary interruption of, the flow of the stream. The Commission is satisfied that it has overcome this objection by its provision for a reregulating dam. It has approved the technical features involved and the site for that dam will be acquired in accordance with the property laws of Oregon.[20] In this reregulation of the flow of the stream, the Commission acts on behalf of the people of Oregon, as well as all others, in seeing to it that the interests of all concerned are adequately protected.

There remains the effect of the project upon anadromous fish which use these waters as spawning grounds. All agree that the 205-foot dam will cut off access of some fish to their natural spawning grounds above the dam and that such interruption cannot be overcome by fish ladders.[21] However, the State does not flatly prohibit the construction of dams that cut off anadromous fish from their spawning or breeding grounds.[22] One alternative,

---

[20] While the final approval of the engineering requirements of this feature rests with the Commission, there is no reason why the Commission and the State of Oregon, which also desires appropriate reregulation of the flow of the stream, should not seek a mutually satisfactory solution. In fact, the applicant for the federal license did submit its proposals for reregulation to the state authorities.

[21] The Oregon Fish Commission made a rough estimate of the annual runs of spring chinook and salmon passing the Pelton site, en route upstream, at 2,500 and of summer steelhead trout at 5,000. On the basis of this escapement past the project, the Fish Commission estimated the annual value of the Deschutes salmon and steelhead fishery attributable to the river above the Pelton site to be $177,375. 10 F. P. C., at 449, 92 P. U. R. (N. S.), at 252.

[22] ". . . In the event that any person desires to construct a dam in any of the streams of this state to a *height that will make a fish ladder or fishway thereover impracticable*, in the opinion of the [Fish] commission, then such person may make an application to the commission for a permit to construct such dam, and the commission is

450

thus recognized, is the supplying of new breeding pools to which the fish can be removed at appropriate times.[23] The Fish Commission of Oregon has denied a permit to the Portland General Electric Company to carry out its present proposal but there appears to be no disagreement as to the underlying principle involved.[24]

---

hereby authorized to grant such permit in its discretion, upon the condition that the person so applying for such permit shall convey to the state of Oregon a site of the size and dimensions satisfactory to the commission, at such place as may be selected by the commission, and erect thereon a hatchery and hatchery residence, according to plans and specifications to be furnished by the commission, and enter into an agreement with the commission, secured by a good and sufficient bond, to furnish all water and' light, without expense, to operate said proposed hatchery; and no permit for the construction of any such dam shall be given by the commission until the person applying for such permit shall have actually conveyed said land to the state and erected said hatchery and hatchery residence in accordance with the said plans and specifications. . . ." (Italics supplied.) Ore. Comp. Laws, 1940, § 83–316.

[23] The Federal Power Commission here found that:

"(29) There is nothing novel, unusual or out of the ordinary with respect to the fishery conservation facilities proposed by applicant.

"(30) The applicant proposes to operate or arrange for the operation of the fish conservation facilities in accordance with approved methods.

"(31) Construction, or operation and maintenance of the Pelton project will not be detrimental to the fishery resources below the reregulating dam.

"(32) There is no substantial evidence in the record to show that the fishery facilities proposed by the applicant in accordance with the plans prepared by the Fish Commission of Oregon will not maintain existing runs, and there is a possibility that the run can be increased." 10 F. P. C., at 455.

[24] In addition to its application to the Federal Power Commission, the Portland General Electric Company also sought approval of the Pelton Project by the Oregon Hydroelectric Commission. While we hold that such approval is not necessary, there is no reason why the company should not thus seek state as well as federal approval of the project. In its application for the Federal Power Commission

The applicant has agreed to provide facilities for conserving the runs of anadromous fish in accordance with plans approved by the Federal Power Commission. The capital cost of these facilities and of the reregulating dam, to be borne by the applicant, is estimated at $4,430,000. The total annual cost due to these facilities is estimated at $795,000. The Commission has found each of these estimates to be reasonable. Of the $795,000 annual cost, the applicant will bear $410,000 (cost of borrowed money, depreciation and taxes on the capital investment), and the $10,000 maintenance cost of the reregulating dam. In addition, it has offered to contribute $100,000 annually

---

license, the company referred to these simultaneous state proceedings, which did not reach a conclusion until shortly before the granting of the federal license. The license from the Hydroelectric Commission was denied because of the applicant's failure to secure the permit from the Fish Commission of Oregon which it had sought.

The pertinent Oregon provisions are as follows:

"From and after the taking effect of this act, no water-power project involving the use of the waters of any of the lakes, rivers, streams or other bodies of water within the state of Oregon, including waters over which this state has concurrent jurisdiction, for the generation of electricity, shall be begun or constructed except in conformity with the provisions hereof.

.        .     •    .          .          .

"The [Oregon Hydroelectric] commission shall have power: . . . .

"(b) To issue licenses, as hereinafter provided, to citizens of the United States, associations of citizens, private corporations organized under the laws of the United States or any state thereof, to appropriate, initiate, perfect, acquire and hold the right to the use of the waters within the state, including the waters over which the state has concurrent jurisdiction, and to construct, operate and maintain dams, reservoirs, power houses, conduits, transmission lines, and all other works and structures necessary or convenient for the use of such waters in the generation and utilization of electricity." Ore. Comp. Laws, 1940, §§ 119–103, 119–106.

See also, "The provisions of this act shall not apply to any water-power project or development constructed by the government of the United States." *Id.*, § 119–101.

toward the estimated $375,000 cost of operation and maintenance of the fish conservation facilities, and the Commission has retained the power to fix the amount of the applicant's contribution if a sum is not agreed upon.

The care given to the preparation of this conservation program and the large investment to be made in it are impressive. It also is of interest that the Fish Commission of Oregon already is operating somewhat comparable but smaller facilities of this kind on the Metolius River.

One argument against the project goes beyond the need to conserve the existing fish population. It is argued that the project will preclude the carrying out of certain plans for the Columbia River Basin which contemplate greatly enlarging the fish population in the Deschutes River area, by concentrating there other runs of fish not now using that river. While such an argument may properly be directed to the Federal Power Commission or to Congress, it is not one for us to answer upon the basis of existing legal rights.

We conclude, therefore, that, on the facts here presented, the Federal Power Act is applicable in accordance with its terms, and that the Federal Power Commission has acted within its powers and its discretion in granting the license now before us.

The judgment of the Court of Appeals, accordingly, is

*Reversed.*

MR. JUSTICE HARLAN took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, dissenting.

I would not suppose the United States could erect a dam on this nonnavigable river without obtaining its water rights in accordance with state law. If I am right in that assumption, then this dam cannot be built with-

out satisfying Oregon's water-rights law. For the federal licensee who will build this dam acquires all its rights from the United States. And the United States cannot give what it does not have.[1]

The argument pressed on us by the United States is akin to the one urged in *Nebraska* v. *Wyoming,* 325 U. S. 589, 611 *et seq.* In that case, the United States struggled to be rid of the rule of law that made its water rights on nonnavigable streams of the West dependent on state law. It claimed that it owned all the unappropriated water in the basin of the North Platte River. The argument was made not only under the Reclamation Act of 1902, 32 Stat. 388, but also under the Desert Land Act of 1877, 19 Stat. 377, the Act involved here. We reserved decision as to whether under some circumstances the United States might be the owner of unappropriated water rights. But we held that under those Acts the United States took its water rights like other landowners, *viz.,* pursuant to state law governing appropriation.

Unless we are to depart from that ruling, we must accept Oregon's claim here.

---

[1] The Deschutes River is nonnavigable and part of the Columbia River Basin. It is, indeed, a direct tributary of the Columbia. Control of this tributary might be important to an effective flood-control program for the Columbia. If so, this dam could find constitutional sanction under the Commerce Clause. See *Oklahoma* v. *Atkinson Co.,* 313 U. S. 508, 525. That constitutional power over the Deschutes would not be lost through nonuse or through intervening legislation. In case the constitutional power were exercised, private rights would give way. Oregon could demand compensation for the loss of any water-power rights it possessed. See *Federal Power Commission* v. *Niagara Mohawk Power Corp.,* 347 U. S. 239, 254–255. But Oregon could not assert its regulatory powers to defeat the federal program, for the Supremacy Clause would prevent her.

No effort has been made to bring this case under the Commerce Clause. The findings are inadequate for that purpose. The case turns on the authority of the United States as a proprietor.

Oregon's position has for its support two other decisions of this Court, both construing the Desert Land Act. The first of these is *California Oregon Power Co.* v. *Cement Co.*, 295 U. S. 142, which construed the provision of the Desert Land Act, crucial here, which reads:

> "all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights."

The Court interpreted that provision as follows:

> "The fair construction of the provision now under review is that Congress intended to establish the rule that for the future the land should be patented separately; and that all non-navigable waters thereon should be reserved for the use of the public under the laws of the states and territories named." 295 U. S. 142, 162.

That case, to be sure, involved a contest between private owners. But the principle announced was shortly applied to the United States as a property owner on a nonnavigable stream.[2] In *Ickes* v. *Fox*, 300 U. S. 82, the

---

[2] If this were a navigable stream, the authority of the United States in the water power would be complete without reference to state law. *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53; *United States* v. *Chicago, M., St. P. & P. R. Co.*, 312 U. S. 592; *United States* v. *Commodore Park, Inc.*, 324 U. S. 386. In that case, the Act authorizes the Commission to proceed, irrespective of the approval of the State where the dam is located. *First Iowa Coop.* v. *Power Commission*, 328 U. S. 152. But the present project, dealing as it does with nonnavigable waters, is dependent on the state law of water rights for its execution. In the *First Iowa Coop.* case, we recognized the room left for that degree of control by the States in this situation:

"In the Federal Power Act there is a separation of those subjects

Court held that by the Desert Land Act, "if not before, Congress had severed the land and waters constituting the public domain and established the rule that for the future the lands should be patented separately. Acquisition of the government title to a parcel of land was not to carry with it a water-right; but all non-navigable waters were reserved for the use of the public under the laws of the various arid-land states." *Id.*, at 95.

The *Fox* case involved water rights of farmers under a federal irrigation project, the claim being that the United States, owner of the irrigation system, owned the water rights. The Court rejected that claim and looked to state law to determine who had the water rights; and finding that the farmers owned them, the Court held that the United States was not an indispensable party in litigation concerning them.

Those cases should control here. The Desert Land Act applies to "public lands"; and the Federal Power Act, 41 Stat. 1063, as amended, 16 U. S. C. § 791a *et seq.*, grants the Commission authority to issue licenses for power development "upon any part of the public lands and reservations of the United States." § 4 (e). The definition of those terms in the Act says nothing about water rights.[3]

---

which remain under the jurisdiction of the States from those subjects which the Constitution delegates to the United States and over which Congress vests the Federal Power Commission with authority to act. To the extent of this separation, the Act establishes a dual system of control. The duality of control consists merely of the division of the common enterprise between two cooperating agencies of government, each with final authority in its own jurisdiction. The duality does not require two agencies to share in the final decision of the same issue." *Id.*, at 167–168.

[3] Those terms are defined as follows in § 3:

"(1) 'public lands' means such lands and interest in lands owned by the United States as are subject to private appropriation and disposal under public land laws. It shall not include 'reservations', as hereinafter defined;

"(2) 'reservations' means national forests, tribal lands embraced

And, as I have pointed out, it has been the long-term policy of Congress to separate western land from water rights.

The final resort of the Commission is to the Act of June 25, 1910, 36 Stat. 847, providing:

> "That the President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States including the District of Alaska and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress."

It was under this Act that some of the lands here involved were reserved for a power site. But the Act of June 25, 1910, by its very terms, did no more than withdraw these public lands "from settlement, location, sale, or entry." The Act did not purport to touch or change in any way the provision of the Desert Land Act that pertains to water rights. If the words of the 1910 Act are to control, water rights remained undisturbed. The lands remained "public lands," save only that settlers could not locate on them. I assume that the United States could have recalled its grant of jurisdiction over water rights, saving, of course, all vested rights. But the United States has not expressly done so; and we should not construe any law as achieving that result unless the purpose of Congress is clear.

---

within Indian reservations, military reservations, and other lands and interests in lands owned by the United States, and withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws; also lands and interests in lands acquired and held for any public purposes; but shall not include national monuments or national parks; . . . ."

The reason is that the rule adopted by the Court profoundly affects the economy of many States, ten of whom are here in protest. In the West, the United States owns a vast amount of land—in some States, over 50 percent of all the land. If by mere Executive action the federal lands may be reserved and all the water rights appurtenant to them returned to the United States, vast dislocations in the economies of the Western States may follow. For the right of withdrawal of public lands granted by the 1910 Act is not only for "water-power sites" but for a host of public projects—"irrigation, classifications of lands, or other public purposes." Federal officials have long sought that authority. It has been consistently denied them. We should deny it again. Certainly the United States could not appropriate the water rights in defiance of Oregon law, if it built the dam. It should have no greater authority when it makes a grant to a private power group.