[Sac. No. 6601. In Bank. Dec. 29, 1955.]

THE CALIFORNIA OREGON POWER COMPANY, Petitioner, v. THE SUPERIOR COURT OF SISKIYOU COUNTY, Respondent; THE PEOPLE, Real Party in Interest.

Brobeck, Phleger & Harrison and Gregory A. Harrison for Petitioner.

Edmund G. Brown, Attorney General, and Ralph W. Scott, Deputy Attorney General for Respondent and Real Party in Interest.

Henry Holsinger, Gavin M. Craig and Hugh W. Ferrier as Amici Curiae on behalf of Respondent and Real Party in Interest.

CARTER, J.—This is a proceeding in which petitioner, a public utility and California corporation engaged in the production and sale of electricity in Oregon and California, hereafter referred to as defendant, seeks to have the respondent Superior Court in Siskiyou County prohibited from trying an action pending therein in which the State of California is plaintiff and the power company a defendant.

In its complaint in the above-mentioned action filed in June, 1950, plaintiff alleged that Klamath River runs through Siskiyou, Humboldt and Del Norte Counties in California (its headwaters are in Oregon) and is navigable from its mouth to its confluence with Shasta River in Siskiyou County; that it is inhabited by fish, is regularly stocked by plaintiff, and the fish spawn in its waters; that the fish are the property of plaintiff and held in trust for its people; that about 1917 defendant built two dams, Copco 1 and 2, across the river at Copco, Siskiyou County, California, which together with hydroelectric generating plants, it uses to produce electricity; that in so maintaining and using those facilities defendant controls the natural flow of the river and causes it to fluctuate suddenly by reducing the flow when it is not generating power and increasing the flow when power is being generated; that as a result of such fluctuations large areas of the bed, banks and bars along the river for 75 miles downstream from Copco are and have been suddenly and abruptly uncovered or drained of water when defendant's hydroelectric plants are shut down, causing about 1,900,000 fish to die; that when the plants are placed in operation after a temporary shutdown the result is a "wave front" caused by the sudden release of water which is a danger and menace to public safety and welfare, indeed, 14 persons have been drowned in an eight-year period as a result thereof; that such conduct of defendant constitutes a public nuisance and defendant has refused to take any action to alleviate it. In its complaint plaintiff prayed that the nuisance be abated and defendant enjoined from engaging in such injurious activities.

Defendant demurred to the complaint, asserting the court lacked jurisdiction. It also made the same claim in its answer after the demurrer was overruled and by way of motion to dismiss, which motion also sought leave to amend its answer showing subsequent proceedings before the Federal Power Commission and to abate the action because of those proceedings. The motion was denied.

Defendant contends that the respondent has no jurisdiction because (1) the Federal Power Commission has exclusive jurisdiction under federal law over the location and regulation of dams on navigable streams; (2) plaintiff has failed to exhaust its administrative remedy before that commission; (3) the California Public Utilities Commission has exclusive state jurisdiction over the issues presented; (4) plaintiff has an adequate remedy at law and hence is not entitled to injunctive relief; and (5) the subject matter is legislative, not judicial.

Turning to the first contention, it appears that defendant never has obtained a license from the Federal Power Commission for its Copco dams. After the action here involved was commenced and in April, 1951, it filed an application with that commission to launch Big Bend No. 2 Development which included additional dams one of which (Iron Gate) would allegedly ameliorate the fluctuation of the river. In November, 1951, the commission ordered defendant to show cause why it should not get licenses for the Copco dams, whether it was violating the Federal Power Act and other matters. Thereafter in June, 1952, plaintiff filed with the Federal Power Commission a petition to intervene in the proceedings before the commission and set forth the claims made by it in its complaint in the action here involved and asked for relief. Defendant answered plaintiff's petition to intervene setting forth the pleadings in the state court action. The commission granted plaintiff's petition. Hearings were had by the commission in 1952 and in 1954 it ordered defendant to file applications for all its power installations on the Klamath River because it maintains dams (Copco 1 and 2) which fluctuate the flow and thus affect navigation and interstate commerce; it reserved jurisdiction to determine whether the construction of any regulating dam such as Iron Gate was necessary to avoid the fluctuation.

The Federal Power Act (16 U.S.C.A. § 791 et seq.) creates the Federal Power Commission (*id.*, § 792). It is empowered to investigate water resources and the water power industry

and to issue licenses for the purpose "of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States. . . ." (*Id.*, § 797.) It is ". . . unlawful for any person, State, or municipality, for the purpose of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto across, along, or in any of the navigable waters of the United States . . . except under and in accordance with the terms of a permit or valid existing right-of-way granted prior to June 10, 1920, or a license granted pursuant to this chapter." (*Id.*, § 817.) It may on its own motion order an investigation of occupancy of, for the purpose of developing electric power, streams over which Congress has jurisdiction and ". . . to issue such order as it may find appropriate, expedient, and in the public interest to conserve and utilize the navigation and water-power resources of the region." (*Id.* § 797(g).) Licenses may be issued for 50 years and conditioned on all the provisions of the act and such further rules as the commission may prescribe; and licenses may be revoked for the reasons specified in the act (*Id.*, § 799). *Applicants for licenses must submit evidence that they have complied with the laws of the state within which the project is located* ". . . with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and distributing power, and in any other business necessary to effect the purposes of a license under this chapter." (*Id.*, § 802(b).) Licenses shall be on the condition that the project will be such as in the judgment of the commission it is best adapted ". . . to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes. . . . (*Id.*, § 803(a).) The licensee shall conform to the commission's rules and regulations "for the protection of life, health, and property" and shall be liable for damages occasioned to the property and others by the maintenance and operation of the project.

(*Id.*, § 803(c).) The United States Attorney General may on request of the commission ". . . institute proceedings in equity in the district court of the United States in the district in which any project or part thereof is situated for the purpose of revoking for violation of its terms any permit or license issued hereunder, or for the purpose of remedying or correcting by injunction, mandamus, or other process any act of commission or omission in violation of the provisions of this title or of any lawful regulation or order promulgated hereunder. The district courts shall have jurisdiction over all of the above-mentioned proceedings and shall have power to issue and execute all necessary process and to make and enforce all writs, orders, and decrees to compel compliance with the lawful orders and regulations of the commission . . . and to compel the performance of any condition imposed under the provisions of this title." (*Id.*, § 820.) And finally, "Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein." (*Id.*, § 821.)

The question thus presented is whether the federal government has occupied the field with respect to the maintenance of dams on navigable streams to the exclusion of state jurisdiction; there is no question of federal supremacy in the regulation of navigable streams.

In *Henry Ford & Son* v. *Little Falls Fibre Co.*, 280 U.S. 369 [50 S.Ct. 140, 74 L.Ed. 483], the New York state court, in an action for upstream riparian owners, had awarded damages and injunctive relief against petitioner, a power company, which had a license from the federal commission to take water from a federal dam and maintain on the top of the dam flash-boards to facilitate its diversion. The flashboard raised the water level above the dam to the riparian owners' damage. The state law made petitioner's conduct an actionable wrong but it relied on its federal license. The court held that even though the commission acted within its jurisdiction in authorizing the project and in the advancement of navigation under the Federal Power Act, *supra*, such act ". . . does not purport to authorize a licensee of the Commission to impair such rights recognized by state law without compensation. Even though not immune from such destruction they are, nevertheless, an appropriate subject for legis-

lative protection." (*Henry Ford & Son* v. *Little Falls Fibre Co.*, 280 U.S. 369, 377 [50 S.Ct. 140, 74 L.Ed. 483].) Reference is made to sections 803(c) and 821, *supra*, the court stating: "While these sections are consistent with the recognition that state laws affecting the distribution or use of water in navigable waters and the rights derived from those laws may be subordinate to the power of the national government to regulate commerce upon them, they nevertheless so restrict the operation of the entire act that the powers conferred by it on the Commission do not extend to the impairment of the operation of those laws or to the extinguishment of rights acquired under them without remuneration." (*Henry Ford & Son* v. *Little Falls Fibre Co.*, *supra*, 378.) This was reaffirmed in *Federal Power Com.* v. *Niagara Mohawk Power Corp.*, 347 U.S. 239 [74 S.Ct. 487, 98 L.Ed. 666], where later cases to the same effect were cited. While the court speaks of private proprietary rights it stresses the sovereignty of the state.

In *First Iowa Hydro-Electric Coop.* v. *Federal Power Com.*, 328 U.S. 152 [66 S.Ct. 906, 90 L.Ed. 1143], the petitioner power company applied to the commission for a license to erect a dam on a navigable stream in Iowa. It did not show in its application (as required by the Federal Power Act, § 802(b), *supra*) that it had complied with Iowa's legislation that a permit from a state agency must be obtained before any dam could be erected and such erections could only be under certain conditions. The court held that a showing of such compliance was not a condition precedent to securing a license from the federal commission. The court stated the question was the need, if any, for petitioner to present evidence to the commission that he had complied with Iowa law (Federal Power Act, 16 U.S.C.A., § 802(b), *supra*). The court said (p. 164): "To require the petitioner to secure the actual grant to it of a state permit under . . . as a condition precedent to securing a federal license for the same project under the Federal Power Act would vest in the Executive Council of Iowa a veto power over the federal project. Such a veto power easily could destroy the effectiveness of the Federal Act. It would subordinate to the control of the State the 'comprehensive' planning which the Act provides shall depend upon the judgment of the Federal Power Commission or other representatives of the Federal Government.

"[T]he State Code requires that 'the method of construction, operation, maintenance, and equipment of any and all

dams in such waters shall be subject to the approval of the Executive Council.' This would subject to state control the very requirements of the project that Congress has placed in the discretion of the Federal Power Commission. A still greater difficulty is illustrated by § 7771. This states the requirements for a state permit as follows:

" '7771 When permit granted. If it shall appear to the council that the construction, operation, or maintenance of the dam will not materially obstruct existing navigation, or materially affect other public rights, will not endanger life or public health, and *any water taken from the stream in connection with the project is returned thereto at the nearest practicable place* without being materially diminished in quantity or polluted or rendered deletrious to fish life, it shall grant the permit, upon such terms and conditions as it may prescribe.' (Italics supplied.)

"This strikes at the heart of the present project. . . .

". . . Compliance with state requirements that are in conflict with federal requirements may well block the federal license. For example, compliance with the state requirement, discussed above, that the water of the Cedar River shall be returned to it at the nearest practicable place would reduce the project to the small one which is classified by the Federal Power Commission as 'neither desirable nor adequate.' Similarly, compliance with the engineering requirements of the State Executive Council, if additional to or different from the federal requirements, may well result in duplications of expenditures that would handicap the financial success of the project. Compliance with requirements for a permit that is not to be issued is a procedure so futile that it cannot be imputed to Congress in the absence of an express provision for it. On the other hand, there is ample opportunity for the Federal Power Commission, under the authority expressly given to it by Congress, to require by regulation the presentation of evidence satisfactory to it of the petitioner's compliance with any of the requirements for a state permit on the state waters of Iowa that the Commission considers appropriate to effect the purposes of a federal license on the navigable waters of the United States." With reference to the power of the state and the United States the court said: "In the Federal Power Act there is a separation of those subjects which remain under the jurisdiction of the States from those subjects which the Constitution delegates to the United States and over which Congress vests the Federal

Power Commission with authority to act. To the extent of this separation, the Act establishes a dual system of control. The duality of control consists merely of the division of the common enterprise between two cooperating agencies of government, each with final authority in its own jurisdiction. The duality does not require two agencies to share in the final decision of the same issue. Where the Federal Government supersedes the state government there is no suggestion that the two agencies both shall have final authority. In fact a contrary policy is indicated in §§ 4(e), 10(a), (b) and (c), and 23(b). In those sections the Act places the responsibility squarely upon federal officials and usually upon the Federal Power Commission. A dual final authority, with a duplicate system of state permits and federal licenses required for each project, would be unworkable. 'Compliance with the requirements' of such a duplicated system of licensing would be nearly as bad. Conformity to both standards would be impossible in some cases and probably difficult in most of them. . . .

"The securing of an Iowa state permit is not in any sense a condition precedent or an administrative procedure that must be exhausted before securing a federal license. It is a procedure required by the State of Iowa in dealing with its local streams and also with the waters of the United States within that State in the absence of an assumption of jurisdiction by the United States over the navigability of its waters. Now that the Federal Government has taken jurisdiction of such waters under the Federal Power Act, it has not by statute or regulation added the state requirements to its federal requirements. . . .

"[This] brings us to consideration of the effect of the Federal Power Act upon it and the related state statutes. We find that when that Act is read in the light of its long and colorful legislative history, it discloses both a vigorous determination of Congress to make progress with the development of the long idle water power resources of the Nation and a determination to avoid unconstitutional invasion of the jurisdiction of the States. The solution reached is to apply the principle of the division of constitutional powers between the State and Federal Governments. This has resulted in a dual system involving the close integration of these powers rather than a dual system of futile duplication of two authorities over the same subject matter.

"The Act leaves to the States their traditional jurisdiction subject to the admittedly superior right of the Federal Gov-

ernment, through Congress, to regulate interstate and foreign commerce, administer the public lands and reservations of the United States and, in certain cases, exercise authority under the treaties of the United States. These sources of constitutional authority are all applied in the Federal Power Act to the development of the navigable waters of the United States." (*First Iowa Hydro-Electric Coop.* v. *Federal Power Com., supra,* 328 U.S. 152, 167.) And in regard to the effect of the reservation of state jurisdiction (§ 821, *supra*) the court said: "The effect of § 27 [16 U.S.C.A., § 821], in protecting state laws from supersedure, is limited to laws as to the control, appropriation, use or distribution of water in irrigation or for municipal or other uses of the same nature. It therefore has primary, if not exclusive, reference to such proprietary rights. The phrase 'any vested right acquired therein' further emphasizes the application of the section to property rights. There is nothing in the paragraph to suggest a broader scope unless it be the words 'other uses.' Those words, however, are confined to rights of the same nature as those relating to the use of water in irrigation or for municipal purposes. This was so held in an early decision by a District Court, relating to § 27 and upholding the constitutionality of the Act, where it was stated that 'a proper construction of the act requires that the words "other uses" shall be construed ejusdem generis with the words "irrigation" and "municipal." ' " *Alabama Power Co.* v. *Gulf Power Co.,* 283 F. 606, 619.

"This section therefore is thoroughly consistent with the integration rather than the duplication of federal and state jurisdictions under the Federal Power Act. It strengthens the argument that, in those fields where rights are not thus 'saved' to the States, Congress is willing to let the supersedure of the state laws by federal legislation take its natural course." (*First Iowa Hydro-Electric Coop.* v. *Federal Power Com., supra,* 328 U.S. 152, 175.) The First Iowa case was followed by *Federal Power Com.* v. *State of Oregon,* 349 U.S. 435 [75 S.Ct. 832, 99 L.Ed. 1215], where the federal commission had granted a license to a power company to erect and maintain a power dam on a nonnavigable stream on property owned by the United States, with provisions for anadromous fish. Oregon sought a review of the order for a license, asserting that the licensee must have a permit from it and adequate provision was not made for the fish. It was held that authorization of the project was within the exclusive

jurisdiction of the federal commission and the state's consent was not necessary. In regard to the claim that the commission had not made adequate provision for the fish or the fluctuation of the natural flow of the river, the court said: "In this reregulation of the flow of the stream, the Commission acts on behalf of the people of Oregon, as well as others, in seeing to it that the interests of all concerned are adequately protected.

"There remains the effect of the project upon anadromous fish which use these waters as spawning grounds. All agree that the 205-foot dam will cut off access of some fish to their natural spawning grounds above the dam and that such interruption cannot be overcome by fish ladders. However, the State does not flatly prohibit the construction of dams that cut off anadromous fish from their spawning or breeding grounds. One alternative, thus recognized, is the supplying of new breeding pools to which the fish can be removed at appropriate times. The Fish Commission of Oregon has denied a permit to the Portland General Electric Company to carry out its present ·proposal but there appears to be no disagreement as to the underlying principle involved." (*Federal Power Com.* v. *State of Oregon, supra,* 832, 840 [75 S.Ct.].) In *State of Wash. Dept. of Game* v. *Federal Power Com.,* 207 F. 2d. 391, certiorari denied, 347 U.S. 936 [74 S.Ct. 626, 98 L.Ed. 1087], it was again held that state laws could not entirely block a project on a navigable stream for which a city in Washington was seeking from the commission a license to construct.

Implicit in the foregoing opinions is the concept that the field is not exclusively occupied for all purposes by the Federal Power Act or the federal commission. There is a duality of control the extent of which is not specified.

While it is clear the state laws may not "veto" projects licensed by the federal commission nor may the giving of a license be made contingent on the state's consent, that is, the state may not block the project completely, there is nothing therein indicating that regulatory state laws which do not achieve that end are not proper. There is nothing said about nuisances or danger to the public in the Federal Power Act, and the giving of any remedial relief seems to rest not with the commission but by court action by the United States Attorney General on request of the commission. Here we are concerned with the abatement of a nuisance, in a sense a local police measure. The federal commission has not purported to adjudicate that question or do anything about it

except to have defendant apply for a license for its dams, Copco 1 and 2, which for many years it has maintained without any effort to obtain a license and the commission has done nothing in regard to the problem. It must be remembered that the present prohibition proceeding goes only to the question of the jurisdiction of the Siskiyou County superior court. ■ The state has not even asked in the action that defendant cease operating its dams; it asks that they be so operated as to not create the danger to the public and the destruction of the fish. Being a jurisdictional question we do not speculate on what the judgment of the Siskiyou court may be. It may find means to alleviate the alleged nuisance without substantially interfering with the power output of the dams. If it has jurisdiction to make any kind of a judgment in the premises—to afford any relief—then it has jurisdiction to try the action. It certainly has general jurisdiction over nuisances and the measures necessary to deal with them. In the First Iowa case, *supra,* the court likened the federal commission to the Interstate Commerce Commission (*United States ex rel. Chapman* v. *Federal Power Com.,* 345 U.S. 153 [73 S.Ct. 609, 97 L.Ed. 918]), hence *Yolo Water etc. Co.* v. *Superior Court,* 43 Cal.App. 332 [185 P. 195], is pertinent in its statement that the superior court could abate a public nuisance by a public utility although such utilities are subject to regulation by the state Public Utilities Commission under our Constitution (Cal. Const., art. XII, §§ 22, 23 and 23a) and state (Pub. Util. Code). The court said (p. 341): "Powers conferred by the constitution upon the Railroad Commission to supervise and regulate public utilities and to bring suits to enforce its orders and compel public utilities to obey the law is not inconsistent with the power conferred upon superior courts to entertain injunction suits instituted by others than the commission against public utilities. To so hold will not create any conflict between the courts and the commission, because in all such suits the courts will be bound and guided and controlled in all respects in entertaining and deciding or dismissing them as much by section 23 of the constitution and the Public Utility Act as by any other provision of the law."

■ Since the Siskiyou County court has jurisdiction in the premises the question of the exhaustion of administrative remedies is not pertinent. ■ The intervention by plaintiff in the federal commission proceeding is not of importance because the question is one of jurisdiction over the subject

matter and the parties cannot grant or exclude such jurisdiction. Further in that connection it cannot be said that an adequate remedy at law exists; that is, proceedings before the federal commission, assuming that such is a jurisdictional question.

There is no merit to defendant's contention that the state Public Utilities Commission has jurisdiction over the subject matter to the exclusion of the superior court. The state commission is given broad powers to regulate public utilities by our Constitution and statutes, *supra* (*People* v. *Western Air Lines, Inc.*, 42 Cal.2d 621 [268 P.2d 723]), but the only case which is directly in point on the issues here present is *Yolo Water etc. Co.* v. *Superior Court, supra,* where the court held that a superior court has jurisdiction to abate a nuisance created or maintained by a public utility and neither the public utility law nor the Constitution excludes such jurisdiction. That case has been cited with approval. (*Truck Owners etc., Inc.* v. *Superior Court,* 194 Cal. 146 [228 P. 19]; *Coast Truck Line* v. *Ashbury Truck Co.,* 218 Cal. 337 [23 P.2d 513].) While the discussion in the Yolo case may be dictum in part, it is persuasive on the point here involved.

In this same connection defendant claims the instant action would take water rights it was said to have (fluctuation of the stream, *Moore* v. *California Oregon Power Co.,* 22 Cal.2d 725 [140 P.2d 798], with respect to lower riparian owners) and that a court cannot alter a utility's water rights without the approval of the state commission, citing *Crum* v. *Mt. Shasta Power Corp.,* 220 Cal. 295 [30 P.2d 30], but those questions go to the scope of the relief which the court may give in the action, questions which are not jurisdictional.

Moreover, the grant of jurisdiction to the commission "is not exclusive, and until the . . . commission has acted in reference to any public utility the superior court has jurisdiction in equity to enforce an obligation imposed by law upon such utility." (*Miller* v. *Railroad Com.,* 9 Cal.2d 190, 195 [70 P.2d 164, 112 A.L.R. 221].)

Defendant urges that respondent court is without jurisdiction in that the issues presented in the action are legislative rather than judicial because the object of the action is to legislate for the future with respect to the regulation of hydroelectric installations on navigable streams and to declare the state's policy in regard to the adjustment of the competing interests, that is, the preservation of fish and maintenance and operation of such dams. Reference is made

to studies by a state legislative committee, the state Fish and Game Commission and the Public Utilities Commission at the request of the Legislature, dealing with the fluctuation of the flow of the Klamath River. Reliance is placed on such cases as *Werner* v. *Southern Calif. etc. Newspapers*, 35 Cal.2d 121 [216 P.2d 825, 13 A.L.R.2d 252], *Lockard* v. *City of Los Angeles*, 33 Cal.2d 453 [202 P.2d 38, 7 A.L.R.2d 990], and *Wilson* v. *Walters*, 19 Cal.2d 111 [119 P.2d 340]. Those cases say that questions of public policy are primarily for the Legislature and it should choose between conflicting policies. The action does not purport to call upon the court for a legislative declaration of policy on the above-mentioned subject. It merely presents the question of what relief if any may be had for the condition which is dangerous to the lives of persons as shown by prior drownings and the destruction of fish. With respect to the condition, activity or conduct which may constitute a public nuisance, the Legislature has declared that ''Anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway is a nuisance.'' (Civ. Code, § 3479.) ''A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal.'' (Civ. Code, § 3480.) ''The remedies against a public nuisance are: 1. Indictment or information; 2. A civil action; or, 3. Abatement.'' (Civ. Code, § 3491.) ▇ The attorney general may bring an action to abate a nuisance on behalf of the state and the people. (*People* v. *Truckee Lbr. Co.*, 116 Cal. 397 [48 P. 374, 58 Am.St.Rep. 183, 39 L.R.A. 581]; *People ex rel. Roberts* v. *Beaudry*, 91 Cal. 213 [27 P. 610]; *People* v. *Glenn-Colusa Irr. Dist.*, 127 Cal.App. 30 [15 P.2d 549].)

The alternative writ is discharged and the petition for a peremptory writ is denied.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., Spence, J., and McComb, J. pro tem.,* concurred.

Petitioner's application for a rehearing was denied January 25, 1956.

*Assigned by Chairman of Judicial Council.