PACIFIC POWER & LIGHT COMPANY, Department of Fish and Game of the State of California, Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent.

Nos. 18853, 18954.

United States Court of Appeals Ninth Circuit.

June 8, 1964.

Rehearing Denied Aug. 6, 1964.

Brobeck, Phleger & Harrison, Gregory A. Harrison, Malcolm T. Dungan, John E. Sparks, San Francisco, Cal., for Pacific Power & Light Co.

Richard A. Solomon, General Counsel, Howard E. Wahrenbrock, Solicitor, Joseph B. Hobbs and Josephine H. Klein, Attorneys, all with the Federal Power Commission, Washington, D. C., for Federal Power Commission.

Stanley Mosk, Atty. Gen. of California, Charles E. Corker, Asst. Atty. Gen., Burton J. Gindler, Deputy Atty. Gen., Los Angeles, Cal., Ralph W. Scott, Deputy Atty. Gen., of California, San Francisco, Cal., for intervenor, Dept. of Fish and Game of State of California.

Before POPE, MERRILL and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge:

These are petitions, consolidated for hearing and determination, to review a decision of the Federal Power Commission. The order in question relates to the Iron Gate Dam on the Klamath River in Northern California, a facility constructed by petitioner, Pacific Power & Light Company (Pacific) under a Commission license. Pacific attacks the portion of the order that requires it to construct, at its expense, a fish hatchery, and to reimburse the Department of Fish and Game of the State of California (Department) for 80 percent of the cost of operating the hatchery and of operating fish egg-taking facilities already constructed. The Department also attacks the order, urging that Pacific should be required to pay 100 percent of the cost of the operation of these facilities, with one exception.[1]

The Klamath River, which rises in Southern Oregon and flows into and across California to the Pacific Ocean, has long been a famous fishing stream, supporting large numbers of anadromous fish: king salmon, silver salmon and steelhead trout. Pacific's predecessor, the California Oregon Power Company (Copco), constructed five hydroelectric plants on the river and its tributaries, between 1908 and 1925. None was licensed by the Commission; three were constructed before the enactment of the Federal Water Power Act on June 10, 1920.

Two of the plants, Copco No. 1, built in 1918, and Copco No. 2, built in 1925, are located close together on the river and about 100 miles from the sea. Their construction cut off access to spawning areas above them, and Copco and the State of California therefore agreed that Copco should build a fish hatchery at Fall Creek, just below Copco No. 2, and an egg-taking station. The hatchery was conveyed to the state, which operated it at its own expense, until 1948, when it was abandoned. Thereafter, eggs taken at the station were transported by the state to its Mt. Shasta hatchery.

Copco No. 1 and No. 2 have been operated as peak load facilities. Water was released downstream only when it was desired, because of demands on the Copco system, to add their power output. This has resulted in sudden and extreme fluctuations in the flow of the river, which, in turn, has been detrimental to the fishery and hazardous to human life.

---

1. The Department voluntarily consents to bear operation and maintenance costs of Iron Gate Fishery facilities that may be incurred for all king salmon eggs taken at Iron Gate over 15,800,000 annually, and 19% of the quantity up to that figure. It asserts that it has not agreed to bear any costs with respect to species other than king salmon, or 81% of the king salmon eggs up to 15,800,000 annually.

The Department takes this distinction based upon its historical assumption of operation and maintenance costs of the now abandoned Fall Creek facilities and facilities substituted since its abandonment. However, this distinction becomes irrelevant in view of the conclusions we reach, *infra*.

While Copco claimed that its operation in this manner had continued so long that it had a prescriptive right to continue it, the state took a contrary position, and sought to prevent the operation as a public nuisance. In 1950 it filed suit for that purpose. (See California Oregon Power Co. v. Superior Court, 1955, 45 Cal.2d 858, 291 P.2d 455).

In 1951, Copco applied to the Commission for a license to construct another facility, called Big Bend No. 2. The Commission then issued an order requiring it to show cause why all of the existing facilities should not be brought under license. (See California Oregon Power Co., 10 F.P.C. 1561) In 1954, the Commission held that all of the facilities were within its jurisdiction. (13 F.P.C. 1; 15 F.P.C. 14; California Oregon Power Co. v. F.P.C., 1956, 99 U.S.App. D.C. 263, 239 F.2d 426) The 1954 order left open the question whether a license should require the installation of re-regulating facilities at Iron Gate.

In 1957, Copco asked for a license, Project No. 2082, for the existing facilities, and also for an amendment of the license to authorize the Iron Gate development, for two stated purposes, production of power and regulation of the flow of the river. Thereafter, in 1959, Copco and the state entered into an agreement which refers to the state's pending lawsuit and Copco's pending application for a license for Iron Gate. It recites that Iron Gate will regulate the flow of the river in the manner desired by the state, and that the desire of the parties is to facilitate the issuance of the license. Copco agrees to proceed with the development as soon as licensed, and to release water from it in a manner specified. The agreement, paragraph 3, also provides: "Copco shall construct permanent fish trapping and egg collecting facilities at or near and downstream from the Iron Gate development, * * * and title thereto, * * * shall, upon completion of the facilities, be conveyed by Copco to the State;".

Copco received from the state a dismissal, with prejudice, of its lawsuit, and a release. It agreed, pending construction of Iron Gate, to "manually operate" Copco No. 1 and No. 2 so as to limit downstream fluctuations. The release is: "* * * from any and all claims, demands, actions and causes of action, for any and all legal and equitable relief arising at any time in the past, and for such reasonable future time as may be necessary for construction of the Iron Gate development referred to in said agreement by reason of alleged conduct of Copco of the kind described in the complaint in an action in the Superior Court of the State of California, in and for the County of Siskiyou, No. 13995." The agreement states, in reference to the release and dismissal: "The parties hereto understand and agree that the effect of said dismissal with prejudice and said release will be that no claim will ever be made against Copco in the future for damages or any other relief arising out of any act or omission of Copco, up to the date of this agreement so long hereafter as Copco shall perform its obligations under this agreement, of the kind embraced within the complaint in said state court suit; but that the prosecution of any action hereafter brought, claiming relief by reason of alleged wrongful conduct of Copco occurring after the date of this agreement, shall not be prejudiced thereby." It also provides: "The State, the Department and the [California Fish and Game] Commission shall forthwith cause to be withdrawn and dismissed all protests and interventions with respect to the pending applications of Copco before the Federal Power Commission in Project No. 2082, and before the State Water Rights Board in Application No. 17,527; provided, that the right is reserved to all parties hereto to be heard in any future proceedings in regard to fishery facilities, other than the fish trapping, and egg collecting facilities referred to in paragraph 3 thereof." It does not state at whose expense the fish trapping and egg collecting facilities are to be operated. Pacific asserts that conveyance of title to the state means that the state is to operate them at its own expense, particularly because the reservation of

the rights to be heard in future proceedings in regard to fishery facilities expressly excepts the fish trapping and egg collecting facilities.

Pursuant to the agreement, the state, the Department and the California Fish and Game Commission withdrew their protests and interventions in the Commission's Project No. 2082, and the Commission issued its license for Iron Gate in January, 1960. (23 F.P.C. 59; 25 F.P.C. 579). The order amends the license for Project No. 2082 to include the existing facilities, and to authorize Iron Gate, all as part of a single project. Article 30 contains the following reservations: "The Commission reserves the right to determine at a later date after notice and opportunity for hearing, the following matters * * * (b) Whether the Licensee for Project No. 2082 shall construct, operate and maintain a fish hatchery and appurtenant facilities."

Article 42 requires construction of the agreed-upon fish trapping and egg collecting facilities. It is silent on the subject of their operation. Article 43, on the other hand, requires Copco to construct, maintain and operate fish ladders, fish traps, or other fish handling facilities or fish protective devices.

An amendment of March 27, 1961 adds Articles 49 and 50:

"Article 49. The Licensee shall construct, maintain, and operate or shall arrange for the construction, maintenance, and operation of artificial propagation facilities and such other permanent fish facilities and protective devices including, but not limited to, fish-hauling trucks, fish screens or ladders, and comply with such reasonable modifications in project structures and operation in the interest of fish life as may be prescribed hereafter by the Commission upon the recommendation of the Secretary of the Interior and the California Department of Fish and Game, after notice and opportunity for hearing.

"Article 50. The Licensee shall construct, concurrently with the construction of Iron Gate Dam, and thereafter operate and maintain permanent fish trapping, collecting, holding, and spawn-taking facilities and appurtenances at or near and downstream from Iron Gate Dam as may be prescribed hereafter by the Commission upon the recommendation of the Secretary of the Interior and the California Department of Fish and Game, after notice and opportunity for hearing."

Articles 42 and 43 were eliminated. The license, as so amended, was accepted by Copco.

In August, 1961, the Department petitioned, in Project No. 2082, pursuant to Article 49, for an order requiring Pacific to construct, operate, and maintain a hatchery adjacent to the egg collecting station. The petition does not ask that Pacific be required to pay the cost of operating the egg collecting station. Pacific denied that a hatchery was necessary or appropriate, and the matter was heard on these pleadings. Pacific and the Department stipulated as to the size and type of hatchery that would be built, if the Commission should so order, but reserving Pacific's claims that a hatchery was not required and that, if required, Pacific should not pay for it or for its operation. The power of the Commission to require the construction and operation of fishery facilities, including a fish hatchery, rests on section 10(a) of the Federal Power Act, 16 U.S.C. § 803(a), which provides that all licenses issued by the Commission shall contain conditions:

"That *the project* * * * shall be such as in the judgment of the Commission will be best *adapted to a comprehensive plan for improving or developing a waterway or waterways* for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and *for other beneficial public uses, including recreational purposes*; * *"

(Emphasis added)

The petitioners are agreed that the Commission is empowered by this subsection to require the construction and maintenance of a fish hatchery. The basic questions, then, are whether this is an appropriate case for the exercise of that power, and if so, whether the power has been properly exercised. Pacific also concedes that the question of whether a hatchery should be built was reserved, both in its agreement with the state and in the Commission's prior orders, and was properly before the Commission upon the Department's August, 1961 petition. Its contention is that the evidence does not sustain the determination that a hatchery was needed. We do not agree.

The evidence shows that one of the reasons for constructing the Iron Gate Dam was to regulate the flow of the stream, so as to eliminate the extreme fluctuations caused by the method of operating Copco Nos. 1 and 2. It was Copco that chose to operate them that way. It could have abated the fluctuations by operating them in a different manner. It preferred the Iron Gate Dam because this would assure the continued operation of Copco Nos. 1 and 2 as peak load facilities, would create another source of power at Iron Gate Dam itself, and would eliminate the fluctuations as the state was seeking to require, both in its lawsuit and before the Commission. The fact that the state, which had been seeking to abate what it claimed to be the nuisance created by Pacific's method of operating its two facilities, decided to accept this method of abatement, does not make the choice that of the state rather than that of Pacific. At most it makes it the choice of both. When parties settle a controversy, the settlement is ordinarily not forced by one upon the other—usually it is a result somewhere between the desires of either.

The way in which these objectives were accomplished was by the building of a dam at Iron Gate, some 8 miles below Copco No. 2. This created a reservoir area some 8 miles long, into which flows the irregular discharges from the two Copco facilities, and in which they are held. The power plant and dam at Iron Gate are then so operated as to maintain a reasonably continuous discharge of water below Iron Gate. This does eliminate the fluctuations below Iron Gate, and does improve the fishery below Iron Gate.

There is, however, another result. The new reservoir, above Iron Gate, submerges some 16 miles (about 8 on the Klamath; about 8 on its tributaries) of the better fishing and spawning grounds on the river. It covers them with comparatively still water, and renders them unfit for spawning, and less desirable as habitat. The evidence supports, though it may not require, a finding that most fish headed upstream and reaching the barrier of Iron Gate Dam will not turn back downstream to spawn, and that a substantial percentage (perhaps over 50%) of the fish moving upstream will be so affected. The fish could not testify. The Commission had to rely upon studies by, and the opinion testimony of, expert biologists. In the nature of things, precision in prediction was quite impossible. But as we read the record, we think that it fairly supports the Commission's conclusions that "without a hatchery there can be no assurance that the fishery resource will be preserved and maintained at a level approximately equal to that which existed prior to construction of the Iron Gate Development" and that "[s]ince Licensee has created the situation which necessitates the fish hatchery, it is no more than reasonable to require that it pay the cost of construction thereof."

We have no doubt that the Commission could require Pacific to construct the hatchery at its own expense. Pacific's operations, as a unit, substantially interfere with the natural ecology of the river and deleteriously affect one of its most valuable recreational features. It is quite proper that, as a condition to its having the privilege of so doing, Pacific should be required to pay for facilities that will, at least in part, prevent the impairment of the principal recreational feature of the stream.

The Commission's orders do not directly require that the hatchery be conveyed to the state, as the contract between Pacific (Copco) and the state requires that the egg taking facilities be conveyed. But this result is certainly implicit in the order, else why the requirement that Pacific reimburse the Department for 80 percent of the cost of its operation and maintenance? At oral argument, counsel for Pacific stated that it would prefer to own and operate the hatchery itself. This, however, seems to be an afterthought. We cannot find in the record any indication that it seriously urged this contention before the Commission. There, its position has been (a) that no hatchery is needed, (b) that if one is needed, Pacific should not be required either to build it or pay for it, and (c) that in any event it should not be required to pay for maintenance and operation. It does not now urge that the state is not able or willing to operate the hatchery properly.

██ Assuming that the contention is available to Pacific, we cannot say that it is improper for the Commission to require conveyance of the hatchery to the state. The state and federal governments are not such separate entities, either legally or in fact, that one cannot call upon the other to help to achieve, in the public interest, a result that they both desire. The objective that the Commission seeks here is one that Congress has authorized it to seek. The choice of means, so long as they are reasonably adapted to achieve the authorized end, is not for Pacific, but for the Commission. There is no doubt, upon this record, as to the competence of the state to operate the hatchery, or its willingness to do so. If there be evidence in the record that Pacific is equally able and willing, it has not been called to our attention.

There remain the questions of the expense of maintenance and operation (1) of the hatchery and (2) of the egg taking facilities. As to the hatchery, we think that what we have already said disposes of the question. If the Commission could have required Pacific to build and itself maintain and operate, and if, as we have held, it could require conveyance of the hatchery to the state, it can also require that the state be reimbursed for the expense of maintenance and operation. Unless the hatchery is maintained and operated, its construction means nothing, and the desired end, preservation of the fishery, will not be achieved.

Pacific's reply is, first that the Commission is meddling in matters that are beyond the scope of the Federal Power Act, and is acting in contravention of state laws. It says that, if no funds were provided by it, the Department would still be required by state law to operate the hatchery at its expense, and that therefore the Commission's order improperly interferes with the fiscal affairs of the state, and unlawfully imposes upon Pacific a burden that, under state law, Pacific is entitled to have the state bear. It says, second, that its settlement agreement with the state gives it a contract right to have the state maintain and operate the hatchery.

In support of its first argument, Pacific cites Section 5938 of the California Fish and Game Code. That section provides:

"Whenever in the opinion of the [California Fish and Game] commission it is impracticable, because of the height of any dam, or other conditions, to construct a fishway over or around the dam, the [*California Fish and Game*] commission may, in lieu of the fishway, *order the owner of the dam completely to equip*, within a specified time, on a site to be selected by the department, *a hatchery*, together with dwellings for help, traps for the taking of fish, and all other equipment necessary to operate a hatchery station, according to plans and specifications furnished by the department. *After such hatchery has been constructed*, the department shall operate *it* without further expense to the owner of the dam except as provided in Sections 5940 and 5941." (Emphasis and bracketed words added.)

It was first enacted in 1917 (Cal.Stats. 1917, ch. 749, § 1), before the Federal Water Power Act, and on its face deals only with hatcheries ordered constructed by the state. It does not purport to deal with federally licensed projects. Here, it is the Commission, not the state, that ordered the hatchery constructed. The Department's request that the Commission do so does not make the order the state's order. Indeed, we think it doubtful that the state could have ordered this federal licensee to construct a hatchery at this federally licensed facility. We think there is nothing in Pacific's first contention. Nor is there anything in Pacific's argument that the Department has no authority to receive or use the funds required to be paid to it. We doubt if Pacific has any standing to raise the question. Section 13,001 of the California Fish and Game Code does not support Pacific's arguments.

The short answer to Pacific's second contention is that there is nothing in the agreement with the Department, or the release, that requires that the Department, rather than Pacific, pay for the operation or maintenance of the hatchery. On the other hand, Article 49 of Pacific's license does require Pacific to "construct, maintain and operate, or * * * arrange for the construction, maintenance and operation of artificial propagation facilities * * * as may be prescribed hereafter by the Commission * * *."

The egg taking facilities present a different question. They were provided for in Pacific's agreement with the Department, had been constructed and conveyed to the Department, and were being operated by the Department, when the order under review was made. We assume that Article 50 reserves the question as to who shall pay for operation and maintenance, as the Department claims.[2] But we are of the opinion that the contract, although it does not specifically refer to maintenance and operation, contemplates maintenance and operation by the Department, and that the reservation in the contract relating to fishery facilities, which specifically excepts these facilities from its terms, does not reserve to the Department the right to demand that maintenance and operation be paid for by Pacific. The Department made a post hoc attempt to keep the question open by accepting the conveyance of the facilities, as agreed, but seeking to reserve the question unilaterally. This, however, cannot change the effect of the agreement, although the Commission seems to rely rather heavily upon it. We do not think that Article 50 is a valid contrary determination by the Commission. Nor does the original reservation in Article 30 of the license for Iron Gate reserve this question. The Department's petition did not ask for this relief specifically.

It may well be that none of these facts, as a matter of law, prevents the Commission from requiring Pacific to pay for the maintenance and operation of these facilities.[3] But the existence of power in the Commission does not dispose of the problem. The state arrived at a settlement with Pacific, under which these facilities were constructed and conveyed by Pacific to it. The Commission, to that extent, saw to it that the state got this benefit of its bargain. The state reserved no right to make further demands in this connection. We hold that

2. We are not, however, convinced that it does. Article 50 refers to facilities of this kind that "may be prescribed hereafter * * * after notice and hearing." Hereafter must mean after March 27, 1961, when Article 50 was added to the license. The Commission had previously, in Article 42, of January 13, 1960, ordered Pacific to construct the agreed facilities. They were completed and tendered to the state by February of 1962. How, then, can Article 50 refer to them? On its face, it appears to refer to possible different or additional facilities.

3. The Commission says that it is not bound by any agreement between Pacific and the Department, citing F. P. C. v. Oregon, 349 U.S. 435, 75 S.Ct. 832, 99 L.Ed. 1215, First Iowa Hydro-Electric Coop. v. F. P. C., 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143, and other cases. This, however, does not mean that the Commission can arbitrarily disregard the contract.

it impliedly agreed to pay for maintenance and operation. This, together with the Commission's orders relating to the hatchery, appears to us, absent other facts, to assure the desired preservation of the fishery. The Commission gives us no reason in public policy why the Commission should now transfer the burden to Pacific and relieve the state from its bargain. We think that it would be justified in so doing only if it found upon sufficient evidence that there are sound reasons to do so. It made no such finding or determination. So far as its findings and opinion reveal, it based its decision entirely upon what we hold to be its erroneous legal conclusions, either (a) that the state had not agreed to pay the cost of operation and maintenance, or (b) that the state could unilaterally relieve itself of its obligations, or (c) that Article 50 had the effect of relieving the state of its obligations.

The Commission now asserts in its brief that it is not bound by the contract, assuming that it means what Pacific says that it does and what we hold that it does. We quite agree that this is not a private lawsuit between Pacific and the Department. We also agree that the Commission is not "bound" by the contract. We do not, however, think that this alone is a reason for disregarding the contract.[4] As the Supreme Court has said in Burlington Truck Lines, Inc. v. United States, 1962, 371 U.S. 156, 167, 83 S.Ct. 239, 9 L.Ed.2d 207:

> "There are no findings and no analysis here to justify the choice made, no indication of the basis on which the Commission exercised its expert discretion. We are not prepared to and the Administrative Procedure Act will not permit us to accept such adjudicatory practice. See Siegel Co. v. Federal Trade

Comm'n, 327 U.S. 608, 613–614, 66 S.Ct. 758, 761, 90 L.Ed. 888. Expert discretion is the lifeblood of the administrative process but 'unless we make the requirements for administrative action strict and demanding, *expertise*, the strength of modern government, can become a monster which rules with no practical limits on its discretion.' New York v. United States, 342 U.S. 882, 884, 72 S.Ct. 152, 153, 96 L.Ed. 662 (dissenting opinion). 'Congress did not purport to transfer its legislative power to the unbounded discretion of the regulatory body.' Federal Communications Comm'n v. RCA Communications, Inc., 346 U.S. 86, 90, 73 S.Ct. 998, 97 L.Ed. 1470."

The Commission does not act in a vacuum, and we think it just as much bound to take into account a contract of this kind, which, if carried out, would assist in accomplishing the result that the Commission desires, as it is to take into account the topography of the Klamath River Basin and the biological functioning of anadromous fish. Surely, it would be arbitrary if the Commission had concluded, in the face of the evidence, that the fish would spawn successfully in the reservoir formed by the Iron Gate Dam, when all of the evidence is that they would not. So here we think it arbitrary for the Commission to disregard the contract for no apparent reason. It has not found, and it makes no attempt to point to any evidence that would support a finding of reasons to disregard the contract and thus relieve the state of its bargain.

There remains the Department's contention that the Commission could not require that it pay 20 percent of the cost of maintenance and operation of the hatchery. The Commission did not so

---

4. The Federal Power Act, § 313(b) (16 U.S.C. § 825*l*(b)) declares that this court, on review of an order of the Commission, has jurisdiction "to affirm, modify, or set aside such order [of the Commission] in whole or in part." The Administrative Procedure Act, § 10(e) (5 U.S.C.

§ 1009(e)) directs that this court shall "hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

order. It merely ordered that Pacific pay 80 percent. The Department asserts that section 10(a) of the Act, quoted supra, requires that the Commission impose the entire cost upon Pacific. The section certainly does not do so expressly. It merely requires conditions in the license that, "in the judgment of the Commission," will be best adapted, *inter alia*, "for other beneficial uses, including recreational purposes." We think that this gives the Commission wide latitude, and that its judgment should not be disturbed unless exercised in an arbitrary manner.

Here the Commission determined that "[t]he evidence in the record *suggests* that the regulation of the flow of the Klamath River by the Iron Gate Dam combined with the construction and operation of the hatchery will result in a greater fish population than if Iron Gate had not been built. This would stem from the reduction or elimination of destruction of natural fluctuation and river levels which will follow from the construction of Iron Gate Dam and its operation in accordance with the year-round minimum releases required by Article 52 of the license. To impose on the Licensee the full costs of building and operating the hatchery would not merely restore the status quo, but would actually require Licensee to pay for enhancing the fish production as compared with pre-Iron Gate conditions. Apportioning 20 percent of the operating costs to the Department will *more nearly* result in restoring the status quo." (Our emphasis)

The Department attacks this statement as inconsistent with the formal findings that the hatchery is needed to compensate for the loss of spawning grounds above Iron Gate, and is necessary to sustain the fishery at a level "*approximately equal*" to that which existed before the construction of Iron Gate. In this, the Department is perhaps technically correct. We do not think, however, that the matter should be treated with such iron rigidity. As we have pointed out, the Commission was here dealing with predictions. The evidence

does indeed "suggest" what the Commission says it does. Even the finding on which the Department relies deals only with conditions "approximately equal" to pre-Iron Gate conditions. We do not think that the Commission's conclusion is unreasonable. We need not consider the other bases for its order that are stated in the Commission's opinion. We neither approve nor disapprove them.

We do think, however, that Article 50 of the license is unclear in one respect. Rather than requiring Pacific to pay the full cost of operating and maintaining the hatchery at 80 percent of capacity, it requires that it pay 80 percent of the annual cost of operation and maintenance. Thus, if the Department chose to reject the benefit of full capacity operation (a benefit that the Commission does not claim that it can order the Department to accept) and operates at 80 percent, Pacific would pay only 80 percent of 80 percent. This appears to be inconsistent with the views expressed by the Commission itself. We presume that the Commission intends that, so long as the Department operates the hatchery at at least 80 percent of capacity, Pacific should pay for the cost of operating at 80 percent of capacity, but that in no event should Pacific be required to pay more than actual operating costs.

It may be that there is evidence now in the record, or that other evidence can be produced, that would justify the decision of the Commission as to the operation and maintenance of the fish trapping and egg taking facilities. That is a question for the Commission, not for us. (Burlington Truck Lines v. United States, supra; F. P. C. v. Idaho Power Co., 1952, 344 U.S. 17, 20–21, 73 S.Ct. 85, 97 L.Ed. 15.)

The matter is remanded to the Commission for further proceedings, not inconsistent with this opinion, relating to the cost of operating and maintaining the fish trapping and egg taking facilities, and for such clarification of Article 50 as it may desire to make. In all other respects, the orders of the Commission are affirmed.